

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-17-00265-CR
No. 02-17-00266-CR
No. 02-17-00267-CR

---

MICHAEL WADE BLUE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court Nos. CR15-0396, CR15-0397, CR15-0398

---

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Justice Meier

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Michael Wade Blue appeals his three convictions for arson of a habitation, the jury's deadly-weapon finding of true, and the assessed punishment of twenty-five years' incarceration and a $10,000 fine in each case. In several of his ten points, Blue argues that the trial court abused its discretion by allowing the State to introduce portions of a recording wherein Blue discussed potential future acts of committing arson, transporting marijuana, and assaulting his girlfriend. Blue also argues that the trial court abused its discretion by allowing the State to elicit testimony from his ex-wife's friend wherein she described how she believed that Blue had stalked his ex-wife. Blue further argues that the trial court erred by denying his motion for mistrial after the prosecutor commented on his non-testimonial, courtroom demeanor. And Blue argues that the trial court erroneously denied his motion to suppress certain insurance-claim records introduced by the State. Because we conclude that the trial court did not abuse its discretion by admitting the complained-of recording and that a portion of the admitted recording was harmless, and because we conclude that the trial court did not err by denying Blue's motion for mistrial or by admitting the complained-of documents, we will affirm.

## II. BACKGROUND

Blue and his ex-wife Pam married in late 1995. At the time of their marriage, Pam had two daughters from a previous marriage. Blue and Pam later had two

2

daughters of their own. Around Thanksgiving 2009, Pam told Blue that she wanted a divorce and the two separated. A few months later, Pam began to socialize with and eventually began to date a man named Shane. Blue and Pam finalized their divorce in 2010.

During the early hours of February 6, 2010, as Pam, Shane, Pam's friend, and some of that friend's young children were staying the night at the home of Pam's parents, where she had been temporarily living, the electricity went out and Pam heard a "big bang in the garage." Pam and others then smelled smoke that began to billow into the house from the garage. After franticly removing the children, some personal items, and some of the family's dogs, the house became too dangerous to enter (Fire One). Fire One burned down the house and killed one of the family's dogs. Because Pam's phone was lost in the fire, she called Blue and asked him to contact her brother. Pam averred at trial that Blue's number was the only one she remembered and that shortly after she called him, Blue came to the scene.

Following Fire One, Pam, Shane, and Pam's two younger daughters moved in with Pam's two older daughters. During the early hours of March 7, 2010, Pam awoke to one of her daughters screaming that the house was on fire (Fire Two). Pam, Shane, and all four of Pam's daughters were asleep when Fire Two started. Much like Fire One, Fire Two began in the garage attached to the house. No one was harmed by Fire Two. Pam testified at trial that Blue showed up promptly after Fire Two but that she had not contacted him. Pam and her daughters moved into a hotel.

3

After living in the hotel for a few weeks, Pam and her two younger daughters moved into a duplex. Because of the earlier two fires, Pam did not tell anyone but her parents and Shane where she would be living. But during the early hours of March 27, 2010—less than a day after having moved into the duplex and as Pam, Shane, and her daughters slept—the adjoining duplex's smoke detector woke Pam. Upon exiting the house, Pam saw flames coming through holes in the wall between her garage and the adjoining duplex's garage (Fire Three). Later, investigators determined that the holes in the wall between the garages were not caused by Fire Three.

All three fires occurred in Parker County, Texas, near Weatherford. After Fire Three, Pam stopped seeing Shane, and she and her daughters moved into another duplex. Although this residence never caught fire, Pam averred at trial that flowers mysteriously showed up on the front porch of this new residence.

Investigations into the three fires did not reveal a culprit or a definitive cause of the fires until in April 2015, when Rick Lockett, Blue's longtime friend, contacted Texas Ranger Anthony Bradford to tell him that Blue had confessed to having started the three fires and that Blue had stated he was going to blow up his current girlfriend's house.

After a meeting between Lockett and Bradford, and after Bradford had corroborated that the fires had occurred and that Pam had lived at each of the residences, Bradford arranged for Lockett's vehicle to be bugged to record Blue's

4

confession. As part of the effort to entice Blue to talk about starting the fires again, Bradford advised Lockett to pretend to be interested in having Blue participate in illegally transporting marijuana from Colorado (where Lockett lived) to Texas. Bradford also advised Lockett to ask Blue how he might go about burning Lockett's own house down. The plan worked, and Lockett was able to entice Blue into talking about having started the three fires while their conversation was being recorded.

In the recording, Blue said that he had started the three fires because he was angry with Pam about how she had treated him during their separation. Blue also talked about how someone might start a fire in a home and make it look like an accident. Specifically regarding Lockett's house, Blue explained to Lockett how Lockett could create a situation where he could leave for the weekend and a fire could be set to start well after he was gone, thus creating an alibi for Lockett. Blue also volunteered to burn Lockett's house down for him. Blue further said that he was willing to participate in transporting marijuana from Colorado to Texas. And he explained how he knew how to use cellphone technology to create an alibi. As he hypothesized about creating the alibi, Blue described how, if he wanted to, he could begin a conversation on the cellphone with his then-current girlfriend, wait for her to fall asleep (something Blue suggested she was prone to do), leave the phone in one location, and then sneak over to where his girlfriend was and "put a knife to her . . . throat and . . . slice it."

Blue objected that the recording contained extraneous-offense evidence and that the probative value of some of the things discussed was substantially outweighed by their prejudicial impact. The trial court overruled Blue's objections.

Ultimately, a jury found Blue guilty of causing all three fires and found true that he had used fire as a deadly weapon. The jury assessed punishment at twenty-five years' incarceration for each offense. The trial court rendered judgment accordingly, reflecting the sentences to run concurrently, and this appeal followed.

## III. DISCUSSION

### A.    The Conversation Between Blue and Lockett

#### 1.    Inchoate Thoughts Versus Extraneous Offense Evidence

In his first, third, and fifth points and parts of his second, fourth, and sixth points, Blue argues that the trial court abused its discretion by admitting portions of Blue and Lockett's recorded conversation and by allowing the State to play them for the jury. Specifically, Blue argues that the trial court abused its discretion by allowing publication of the audio wherein Blue discussed with Lockett schemes to commit future crimes—arson and transporting marijuana—along with how he would plan an alibi if he wanted to kill his then girlfriend. According to Blue, playing these portions violated Texas Rule of Evidence 404(b). Tex. R. Evid. 404(b). The State argues that the trial court did not abuse its discretion because the complained-of portions of the audio recording were Blue's references to inchoate crimes and thus did not fall under the ambit of rule 404(b). We agree with the State.

6

We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). Under this standard, a trial court enjoys "wide latitude to exclude, or, particularly in view of the presumption of admissibility of relevant evidence, not to exclude" evidence. *Montgomery*, 810 S.W.2d at 390. A trial court abuses its discretion in admitting evidence only if its ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *Id.* at 391; *see also Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). In other words, an appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *See Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

Generally, under rule 404(b), evidence of a wrong "or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* Tex. R. Evid. 404(b)(1); *Marc v. State*, 166 S.W.3d 767, 775 (Tex. App.—Fort Worth 2005, pet. ref'd). But to constitute an extraneous offense, the evidence must show that a crime or bad act was committed and that the defendant was connected to it. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 966 (1993). To implicate rule 404(b), there must be actual conduct that alone or in combination with these thoughts could constitute a bad act, wrong, or crime. *Massey v. State*, 933 S.W.2d 141, 154 (Tex.

7

Crim. App. 1996). Statements about anticipated acts are mere inchoate thoughts that are not excludable under rule 404(b). *Moreno*, 858 S.W.2d at 463.

Here, each of the statements that Blue complains should have been excluded under rule 404(b) were at best statements about anticipated acts that were nothing more than inchoate thoughts. Indeed, many of the statements that Blue complains of were couched as hypotheticals to Lockett, and all of them were stated as to how Blue or Lockett would complete acts in the future. These thoughts simply do not constitute a bad act, wrong, or crime. *Id.* ("There is no conduct involved which alone or in combination with these thoughts could constitute a bad act or wrong, much less a crime. Absent this, appellant's statements concerning his desire to kidnap and kill Cisneros did not establish prior misconduct and thus were not expressly excludable under Rule 404(b)."). We hold that the trial court did not abuse its discretion by not excluding the complained-of portions of the recording under rule 404(b). Thus, we overrule Blue's first, third, and fifth points and the parts of his second, fourth, and sixth points relating to rule 404(b).

### 2. The Probative Versus Prejudicial Effect of Blue's Statements

In the remainder of his second, fourth, and sixth points, Blue argues that the trial court abused its discretion by allowing the State to play portions of the recorded conversation wherein Blue discussed how he or Lockett could burn down Lockett's house and make it look like an accident, how he might stage an alibi if he were going to slit the throat of his then-current girlfriend, and how he could deliver marijuana to

8

others if he were to be a part of a scheme to transport marijuana illegally from Colorado to Texas. The State counters that this evidence was necessary to demonstrate that Blue possessed the knowledge, motive, and intent to commit the three fires (and to support the jury's deadly-weapon finding); to rebut Blue's defensive theory that he had alibis showing he could not have committed the three fires; and to contextualize Blue and Lockett's conversation. We conclude that the trial court did not abuse its discretion by admitting the portions of the conversation regarding how to burn Lockett's house down or create an alibi. We will assume without deciding that it was improper to admit the portions of the audio discussing transporting marijuana, but we conclude that the admission of this evidence was harmless.

As stated above, we review a trial court's decision to admit evidence under an abuse-of-discretion standard. *See Guzman*, 955 S.W.2d at 89; *Montgomery*, 810 S.W.2d at 391. Rule of evidence 403 states that a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. When undertaking a rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative

9

force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010), *cert. denied*, 563 U.S. 1037 (2011).

### a. Blue Discussing How To Burn Lockett's House Down

In the conversation between Blue and Lockett, Blue explained to Lockett how to burn down Lockett's house and make it look like an accident. Blue even volunteered to commit the arson himself. This evidence was highly probative that Blue had the knowledge, intent, motive, and demeanor to commit arson, the very crime the State set out to prove. Given the overall nature of what Blue and Lockett discussed—how to commit arson and get away with it and how Blue had done so three times—there is little tendency that this evidence would suggest that the jury's verdict for the three arsons and the deadly-weapon finding was decided on an improper basis. This evidence also did not possess a tendency to distract or confuse the jury from the trial's main issues because the very topic discussed was the main issue at trial—that Blue possessed the willingness to commit the three arsons, that he did commit them, and that he ostensibly knew how to get away with them. It also cannot be said that the presentation of this evidence would have created any tendency

10

for the jury to give it undue weight or that the jury was not equipped to evaluate the probative force of the evidence. It is noteworthy that the trial court instructed the jury multiple times that the evidence of Blue's willingness to instruct or commit future acts was being presented for the limited purpose to show motive, intent, plan, or opportunity as to the three charges he did face and not to be considered for character conformity.[1] And the presentation of the entire recording (some of which Blue did not contest) only took a little more than an hour of trial time, and the State's discussion of it in closing argument was less than twenty pages compared to the fourteen-volume reporter's record in this case. We hold that the trial court did not abuse its discretion by determining that the probative value of the portions of the recorded conversation wherein Blue describes how he or Lockett could burn Lockett's house down substantially outweighed any danger of unfair prejudice or that this evidence would have confused or misled the jury. *See Gigliobianco*, 210 S.W.3d at 641–42.

---

[1]Specifically, the trial court instructed: "Ladies and gentlemen, you are instructed that any evidence of other crimes, wrongs, or bad acts by the defendant, other than the charged offenses which may be admitted into evidence in this case, if any, was not admitted to show that the defendant acted in conformity therewith, but was rather admitted to show the defendant's motive, intent, plan, opportunity, the context of a conversation, or that he possessed specialized knowledge, if it does, and you should consider same for only such purpose and for no other."

11

### b. Blue's Hypothetical of Creating an Alibi and Slitting His Girlfriend's Throat

In his conversation with Lockett, Blue also described how he could create an alibi by talking to his then girlfriend on his cellphone, waiting for her to nod off during the conversation (something Blue suggested she was prone to do), leaving his cellphone in the location where he initiated the call, and then going to his girlfriend's house to sneak in and slit her throat. The point of Blue's hypothetical was that he knew how to use cellphone technology to create an alibi for when he committed a crime. This evidence was highly probative and needed by the State to defend against Blue's defensive strategy that he had alibis for each of the three fires.

Blue presented evidence that he had alibis for each of the three fires. For example, Blue presented evidence that he was hours away at the time Fire One was started. Specifically, Blue presented evidence that twelve hours after Fire One was started, he had called a locksmith to unlock his personal truck at the trucking yard that Blue claimed he had been working from during the time of Fire One. For Fire Two, Blue presented evidence that his cellphone would have been in Oklahoma at the time. The need for the State to present evidence that Blue knew how to, and apparently put much thought toward, creating an alibi was strong given Blue's defensive theories.

While it is true that this evidence might have some tendency to suggest a decision on an improper basis or to distract the jury from the main issue of arson, it was highly probative of Blue's intent and motive to create alibis and commit the

arsons. Also, any tendency of this evidence to be given undue weight would have been cured by the trial court's limiting instruction, in which the trial court instructed on more than one occasion that what Blue said hypothetically was to be considered for purposes of intent or motive and not as evidence that he was conforming to his character. And although Blue claims in his brief that the State emphasized this comment in closing arguments, it did not. The prosecutor referred once to "slitting [her] throat," the context of that statement was that Blue knew how to create an alibi, and it was in direct reference to the evidence that Blue had put on that his phone was in Oklahoma at the time of Fire Two. Furthermore, rather than taking an inordinate amount of time to develop, the entire recording was presented once to the jury when the recording was published for them, and the prosecutor referenced the slitting-throat comment only once during closing arguments.

We hold that the trial court did not abuse its discretion by determining that the probative value of the audio portions of the recorded conversation wherein Blue describes how he would create an alibi and commit a serious crime substantially outweighed any danger of unfair prejudice or that that this evidence would have confused or misled the jury. *Id.*

### c. Blue's Admission That He Would Transport Marijuana

In parts of the recording, Blue makes several comments that he would be willing to be involved in transporting marijuana illegally from Colorado to Texas. The

State argues, among other things, that this evidence was necessary to contextualize why Blue and Lockett were having the conversation that led to Blue's admission that he had started the three fires. While it is true that under rule 404(b), "background contextual" evidence is admissible if introduced for the purpose of being helpful to the jury, here, Blue's argument is that the prejudicial value of his discussion with Lockett about transporting marijuana substantially outweighed its probative value under rule 403. *See Moreno*, 858 S.W.2d at 464 (holding, in a capital murder case, that even though testimony that defendant had planned to kidnap and murder another person was admissible under rule 404(b), it was inadmissible under rule 403); *see also Williams v. State*, 834 S.W.2d 502, 507–08 (Tex. App.—Fort Worth 1992, pet. ref'd) (holding that testimony in possession-of-firearm case referring to narcotics and characterizing location where the defendant was apprehended as "criminal location" was admissible because it did not connect the defendant to an extraneous offense). Thus, despite the State's argument that might have gravity if Blue were making a rule 404(b) objection only, this court still must conduct a rule 403 analysis.

We are also not swayed by the State's argument that its introduction of the transporting-marijuana evidence is akin to a trial court admitting evidence under rule 106. *See* Tex. R. Evid. 106. Rule 106 applies when a "party introduces all or part of a writing or recorded statement," so that then "an adverse party may introduce . . . any other part [of the writing or statement] . . . that in fairness ought to be considered at the same time." *Id.* The circumstance in this case is that the State was the party

14

introducing the recorded statement and not Blue, the adverse party, seeking fairness by introducing other portions of the conversation. Thus, rule 106 simply does not apply in this case. *See id.*

To be sure, it would be difficult for the jury to understand why Blue and Lockett were having their conversation if the surrounding conversation of transporting marijuana was withheld from the jury—Lockett's posture during the conversation was that he did not know if he could trust Blue to be part of the transporting scheme given his prior admission of having sought revenge on Pam by setting the fires. But the conversation about transporting marijuana from Colorado to Texas was some evidence that Blue had a general propensity to commit crimes, and the State's need for the evidence was not necessary. Thus, we will assume without deciding that the trial court abused its discretion by admitting this complained-of portion of the audio, but we conclude that its admission was harmless.

Because the assumed error is not constitutional, we apply rule 44.2(b). Tex. R. App. P. 44.2(b); *see James v. State*, 335 S.W.3d 719, 726 (Tex. App.—Fort Worth 2011, no pet.) ("Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by rule 44.2(b) if the trial court's ruling merely offends the rules of evidence."). That rule requires us to disregard any nonconstitutional error that does not affect appellant's substantial rights. Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d

15

510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining whether an error affected an appellant's substantial rights, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

Here, in view of the entire record, we have a fair assurance that the admission of evidence suggesting that Blue would be willing to illegally transport marijuana did not influence the jury or had but a slight effect. As explained above, the recording also contained Blue's confession to having committed the three arsons, his propensity to devise schemes for committing arson and creating alibis for himself, and how strongly he felt about the perceived wrongs in Pam's treatment of him during their separation. The State also presented evidence that Blue had stalked Pam during their

separation, the State never emphasized the complained-of evidence, and the recording was played for the jury only once. And the trial court instructed the jury multiple times that it was not to consider the complained-of testimony as evidence that Blue had a general propensity to commit crimes. We hold that even assuming the trial court abused its discretion by allowing Blue's statements about his willingness to participate in transporting marijuana to be played for the jury, the erroneous admission did not affect Blue's substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Motilla*, 78 S.W.3d at 355 ("[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'").

Having held that the trial court did not abuse its discretion by allowing the State to play for the jury Blue's discussion with Lockett about committing future arson and how to create alibis, and having held that even assuming the admission of Blue's conversation with Lockett about transporting marijuana was error, that admission did not affect Blue's substantial rights, we overrule the remainder of Blue's second, fourth, and sixth points.

## B. Parker's Testimony That Pam Believed Blue Was Stalking Her

In his seventh and eighth points, Blue argues that the trial court abused its discretion by allowing Lauren Parker to testify that she, Pam, and another friend went dancing one night prior to Fire One and that after the three left the club, they saw

17

what they believed to be Blue's van parked in a nearby parking lot. According to Parker, they turned around to see if it was Blue, but she said that the van had driven away by then. They also discovered that someone had keyed their truck while they were in the club. Parker also averred that Pam believed that Blue had been stalking her. The State argues that the admission of Parker's testimony, even assuming it was inadmissible, was harmless because Blue did not object when the same evidence was admitted later at trial. We agree with the State.

Prior to Parker's testimony about seeing the van, the State requested a bench conference. Initially, Blue objected and stated, "This is an extraneous. If it's going to be overruled, we'd ask for a running objection, Judge." But as the colloquy continued, Blue morphed his argument to:

> I don't think we get past the -- the Defense objection to it would be the probative value is outweighed by the prejudice of this one, Judge. And the witness has also said she has memory issues. And I feel for her.
>
> But her memory issues at this point, taking into account, too, the prejudicial value of that statement not being 100 percent certain that it was the defendant at this point in the trial. Punishment, that's a different issue.

Ultimately, the trial judge ruled that he was "going to overrule the objection. But [that he was granting] a running objection to this line of questions." After the prosecutor began to question Parker in front of the jury, Parker responded to one of the questions that she could not remember. At that time, Blue again objected:

18

"Excuse me, Your Honor. I renew my objection we made at the bench. She now states she can't remember."

On the next day at trial, without any objection and after an intervening witness between Parker and Pam, Pam testified to the exact content that Parker testified to regarding what they saw the night their truck was keyed. On appeal, Blue complains only that Parker's testimony was erroneously admitted. Blue makes no mention of Pam's testimony that later detailed the same events.

A defendant must timely object each time the State offers inadmissible evidence unless the defendant obtains a running objection, which is an exception to the contemporaneous-objection rule. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991). And although a request for a running objection is generally considered timely and preserves error, the use of a running objection is limited and cannot encompass too broad a subject matter, during too broad a time, or over different witnesses. *Ford v. State*, 919 S.W.2d 107, 113–14 (Tex. Crim. App. 1996); *see, e.g.*, *Goodman v. State*, 701 S.W.2d 850, 863 (Tex. Crim. App. 1985) (holding that "running objection to all questions concerning the offense, the nature of the offense, and everything related to the offense" made during State's cross-examination of one witness was not sufficient to preserve complaint with respect to different witness who testified later regarding same subject), *overruled in part on other grounds by Hernandez v. State*, 757 S.W.2d 744, 751–52 n.15 (Tex. Crim. App. 1988).

19

Here, it is clear from the context that Blue objected to Parker's testimony and that his objection was partially predicated on her admitted faulty memory. This view of Blue's objection is most notable when he renewed his objection to Parker's testimony after she stated that she could not remember. Moreover, Blue's objection cannot be construed as so broad that it covered Pam's later testimony regarding the same events. *See Sattiewhite v. State*, 786 S.W.2d 271, 283–84 n.4 (Tex. Crim. App. 1989) ("[A]n advocate who lodges a running objection should take pains to make sure it does not encompass too broad a reach of subject matter over too broad a time or over different witnesses."), *cert. denied*, 498 U.S. 881 (1990). And Blue does not challenge Pam's testimony on appeal or even argue that his objection covered her testimony.

Generally, error in the admission of evidence is considered harmless when other such evidence was received without objection, either before or after the complained-of ruling. *See Coble v. State*, 330 S.W.3d 253, 282 n.82 (Tex. Crim. App. 2010) (holding that if party fails to object each time inadmissible evidence is offered, error in admission of evidence is "cured"), *cert. denied*, 564 U.S. 1020 (2011)); *see also Leday v. State*, 983 S.W.2d 713, 716–21 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."); *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without

20

objection and it proves the same fact that the inadmissible evidence sought to prove."). Even assuming that the trial court abused its discretion by allowing Parker to testify to the same events that Pam later testified to, any error is harmless because of Blue's failure to object to the same testimony by Pam. *See Leday*, 983 S.W.2d at 716–21. We overrule Blue's seventh and eighth points.

## C. The Trial Court's Denial of Blue's Mistrial Motion

In his ninth point, Blue argues that the trial court erred by denying his motion for mistrial after the prosecutor made a comment regarding his demeanor at counsel table during closing argument. The State argues that any error was cured when the trial court instructed the jury to disregard the prosecutor's comment. We agree with the State.

During closing argument, the prosecutor asked the jury to observe Blue's demeanor at counsel table: "Well, guess what we have, ladies and gentlemen. We have [Blue], who I observe is sitting over here hiding behind his defense attorney because he can't face you." Defense counsel immediately objected that the prosecutor was "striking at the defendant over the back of the defense attorney." The trial court then had both parties approach, and after a discussion, the trial court announced to the jury that it was sustaining Blue's objection. The trial court then "instruct[ed] the jury to disregard the last comment." Blue moved for a mistrial, which the trial court denied.

21

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Hunt v. State*, No. 02-11-00101-CR, 2012 WL 858613, at *2 (Tex. App.—Fort Worth Mar. 15, 2012, pet. ref'd) (mem. op., not designated for publication). When the refusal to grant a mistrial follows an objection to improper jury argument, we balance the following three factors to determine whether the trial court abused its discretion: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Archie v. State*, 340 S.W.3d 734, 738–40 (Tex. Crim. App. 2011); *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Hunt*, 2012 WL 858613, at *2. Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Hawkins*, 135 S.W.3d at 77; *see Archie*, 340 S.W.3d at 739 ("Mistrial is . . . appropriate . . . when . . . the objectionable events 'are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant.'") (citing *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004)). In most cases, an instruction to disregard will cure the alleged harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).

Even though the prosecutor's comment did not directly impugn defense counsel but rather was more akin to a comment regarding Blue's non-testimonial, courtroom demeanor—and largely because the trial court sustained the objection—we will assume that the prosecutor's remark was an attempt by the prosecutor to strike at Blue over defense counsel's shoulder or that at least the trial court understood the nature of Blue's objection. *Compare Mosley*, 983 S.W.2d at 259 ("Although it is impossible to articulate a precise rule . . . it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character."), *with Rocha v. State*, No. 13-14-00151-CR, 2016 WL 293137 at *2 (Tex. App.—Corpus Christi Jan. 21, 2016) (mem. op., not designated for publication) ("Generally, a prosecutor's comments regarding the defendant's non-testimonial courtroom demeanor do not fit within one of the four approved areas [for proper jury argument], and therefore, are improper.").

Skipping, for the time being, the first factor for determining whether the trial court abused its discretion by refusing a mistrial based on improper jury argument (severity or prejudicial effect), under the second factor, we review the character of the measures adopted to cure the misconduct. *See Archie*, 340 S.W.3d at 739; *Hawkins*, 135 S.W.3d at 77.

The law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed by the jury. *Archie*, 340 S.W.3d at 741; *Gardner v. State*,

23

730 S.W.2d 675, 696 (Tex. Crim. App.), *cert. denied*, 484 U.S. 905 (1987). And generally, a trial court cures any error from an improper jury argument when it instructs the jury to disregard the comment. *See Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex. Crim. App.), *cert. denied*, 513 U.S. 1060 (1994). In this case, the trial court sustained Blue's objection to the prosecutor's argument and ordered the jury to disregard it, and the prosecutor did not revisit this line of argument. The second factor, therefore, weighs heavily in favor of the trial court's ruling.

Returning to the first factor, as noted above, although the prosecutor's statement was not what is traditionally perceived as striking at the defendant over counsel's shoulder, we do recognize that the prosecutor commented on Blue's non-testimonial, courtroom demeanor. Commenting on the defendant's courtroom demeanor is improper jury argument. *See Rocha*, 2016 WL 293139 at *2. Thus, this factor weighs in favor of Blue.

Lastly, under the third factor, the reviewing court looks to the certainty of conviction absent the misconduct. *See Archie*, 340 S.W.3d at 739; *Hawkins*, 135 S.W.3d at 77. We conclude that the evidence to support Blue's conviction was compelling. Given the recording published to the jury containing Blue's admission of guilt to the three arsons, the evidence supporting the convictions was strong, and the jury would have convicted Blue regardless of the prosecutor's comment.

In sum, the magnitude of the prejudice caused by the prosecutor's remark was not so great that a jury would have disobeyed the trial court's instruction to disregard

it.  Under these circumstances, we hold that the trial court did not abuse its discretion by denying Blue's request for a mistrial.  *See Archie*, 340 S.W.3d at 742; *Wilkerson*, 881 S.W.2d at 327.  Accordingly, we overrule Blue's ninth point.

### D.    The Trial Court's Denial of Blue's Suppression Motion

In his tenth point, Blue argues that the trial court erred by denying his motion to suppress insurance records that he claims were obtained in violation of Texas law.  It seems as though Blue is arguing that the prosecutor abused his grand jury subpoena power by obtaining these records and that thus the trial court should have suppressed this evidence.  The State counters that Blue has no standing to contest the admission of these records because they involve Pam's and her father's insurance claims and not Blue.  We agree with the State.

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

A defendant has no standing to complain about evidence seized in violation of Texas law unless the defendant's rights were invaded by the seizure.  *Chavez v. State*,

9 S.W.3d 817, 819 (Tex. Crim. App. 2000) (citing *Fuller v. State*, 829 S.W.2d 191, 201–02 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 941 (1993), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993)), *cert. denied*, 515 U.S. 1137 (1995).

The records that Blue complains of are insurance-claim records including what Pam and her father filled out and filed after the three fires (one of the residences belonged to Pam's parents). Even assuming that these documents were obtained in violation of Texas law, the State's procurement of these documents would not have invaded Blue's rights, and thus he had no standing to complain about the State having obtained them. *See Chavez*, 9 S.W.3d at 819. Therefore, the trial court did not err by denying Blue's motion to suppress these documents.

Relying on *Boyle v. State*, 820 S.W.2d 122, 127 (Tex. Crim. App. 1989), *cert. denied*, 503 U.S. 921 (1992) and *Guardiola v. State*, 20 S.W.3d 216, 225 (Tex. App.—Houston[14th Dist.] 2000, pet. ref'd), for the proposition that the State may not introduce evidence that violates grand-jury subpoena power, Blue argues that the evidence should have been suppressed. But Blue's reliance on these cases is misplaced because in both *Boyle* and *Guiardiola*, the State improperly utilized grand-jury subpoena power to obtain evidence directly from the defendants in those cases. *Boyle*, 820 S.W.2d at 127; *Guardiola*, 20 S.W.3d at 225. Here, the State did not subpoena information from Blue regarding the insurance-claim records; rather, the State subpoenaed these documents from Pam's and her father's insurance companies.

26

Thus, *Boyle* and *Guardiola* are simply not applicable to the facts of this case. We overrule Blue's tenth point.

## IV. CONCLUSION

Having overruled all ten of Blue's points on appeal, we affirm the trial court's judgments.

/s/ Bill Meier
Bill Meier
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 31, 2018