**Elysee MARC, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–03–205–CR.**

Court of Appeals of Texas, Fort Worth.

June 2, 2005.

Donald Davidson, Bedford, for Appellant.

Tim Curry, Criminal District Atty., Charles M. Mallin, Sharon A. Johnson, Mitchell Poe, and Edward Lasater, Asst. Criminal District Attys., Fort Worth, for The State.

Panel A: WALKER, J; WILLIAM BRIGHAM, J. (Senior Justice, Retired Sitting by Assignment); and SAM J. DAY, J. (Retired Sitting by Assignment).

## OPINION

WILLIAM BRIGHAM, Justice.

### INTRODUCTION

Elysee Marc appeals from his conviction for aggravated sexual assault and sentence of ninety-nine years' confinement. In seven issues, appellant complains that the evidence is factually insufficient to support his conviction and that the trial court erred by admitting certain exhibits and hearsay into evidence at the guilt-innocence and punishment phases of trial. We affirm.

### FACTS

While driving in his car, appellant picked up Y.D., a convicted prostitute, and asked her to perform sexual favors for him at his apartment in exchange for fifty dollars. As appellant was driving Y.D. to his apartment, she became nervous and asked appellant to take her back to where he had picked her up. Appellant refused, took out a box cutter, and held it to Y.D.'s throat.

When they reached appellant's apartment, he told Y.D. that if she screamed, he would kill her. Once inside the apartment, appellant told her to take off her clothes. She did, and appellant proceeded to have intercourse with her. The intercourse was

very rough, and Y.D. complained that appellant was hurting her. He ignored her and continued. During intercourse, she told him that he had not paid her. Appellant paused to give her eight or ten dollars out of his pocket, which he later took back. He started intercourse with her again. Y.D. pushed appellant off of her because he was being too rough, and appellant pulled out the box cutter and told her he was going to finish what he was doing. After appellant was done, Y.D. got dressed and appellant agreed to drive her home. But after they drove a few blocks, he stopped and told her to get out.

Y.D. went to a nearby pay phone, called the police, and reported that she had been raped. When the officer arrived, she took him to appellant's apartment and identified his car. Y.D. also submitted to a hospital rape exam. At trial, the parties stipulated that DNA analysis of the semen found in Y.D. came from appellant.

The jury found appellant guilty of aggravated sexual assault. At sentencing, the State introduced evidence that appellant had committed six other rapes and an attempted rape with a deadly weapon. All victims except one were prostitutes.

## FACTUAL SUFFICIENCY

In his first issue, appellant complains that the evidence is factually insufficient to support his conviction.

### Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, the appellate court is to view all the evidence in a neutral light, favoring neither party. *Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim.App.2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reason-

able doubt. *Id.* at 484. There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Id.* at 484–85. "This standard acknowledges that evidence of guilt can 'preponderate' in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt." *Id.* at 485. In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt. *Id.*

In performing a factual sufficiency review, we are to give deference to the fact finder's determinations, including determinations involving the credibility and demeanor of witnesses. *Id.* at 481; *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997). We may not substitute our judgment for that of the fact finder. *Zuniga*, 144 S.W.3d at 482.

A proper factual sufficiency review requires an examination of all the evidence. *Id.* at 484, 486–87. An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

### Discussion

Appellant focuses the entirety of his discussion of factual insufficiency on Y.D.'s veracity and inconsistent statements and conflicting testimony on the issue of consent.

## Veracity

■ Appellant points out that Y.D.'s veracity was "highly suspect" because she was a prostitute, a drug addict, and had been convicted in federal and state court for a variety of theft and felony offenses. Appellant contends that Y.D.'s credibility was further undermined by the fact that she lived at a crack house and prostituted herself to get money for illegal drugs.

Y.D. admitted on cross-examination that she had stolen from her customers in the past and that it was not beneath her to "lie and cheat and steal." Appellant notes that Y.D. admitted to lying to police during the initial investigation by telling them that she had merely asked appellant for a ride to a friend's house in order to avoid getting in trouble for prostitution.

The State responds, stating that Y.D.'s criminal history, drug use, and occupation as a prostitute were known to the jury from the beginning of the State's case. Immediately upon taking the witness stand, Y.D. admitted that she was unemployed, addicted to crack cocaine, smoked several "rocks" a day, earned money as a prostitute, and had numerous criminal convictions.[1] According to Officer Timothy Trull, who took the initial police report on the sexual assault, one of the first things Y.D. told him was that she was a prostitute. The detective assigned to Y.D.'s case testified that he knew Y.D. was a prostitute and that, after interviewing her, he dropped her off at a known crack house.

In addition to hearing Y.D.'s testimony, the jury also heard the testimony of two police officers describing Y.D.'s emotional state after the assault. Officer Trull testified that when he met Y.D. at the conven-ience store where she had called 911, Y.D. was crying and appeared "really upset." Detective Spivey, who had known Y.D. for a long time, met Y.D. at the hospital where she received her rape exam. Detective Spivey noted that Y.D. was crying and more upset than he had ever seen her before. Y.D. testified that although she had been raped in the past, this incident was different because no one had ever threatened to kill her before. This incident was the only time Y.D. made a sexual assault report to the police.

As the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony, a jury may believe or disbelieve all or any part of a witness's testimony. *Page v. State,* 125 S.W.3d 640, 646 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). Based upon Y.D.'s candid testimony and the corroborating testimony of the two police officers, the jury could have chosen to believe Y.D. despite her background and personal history.

## Inconsistent Statements

■ Next, appellant complains that the evidence is factually insufficient because Y.D. made inconsistent statements at trial. First, he points to the inconsistent references to the weapon as a "knife," a "box cutter," and a "razor." Officer Trull testified that Y.D. referred to the weapon as a "knife" when first reporting the assault but later referred to it as a "razor." Ultimately, Y.D. explained during her testimony that a "razor" is the street term for a "box cutter." Accordingly, despite the different terms used, the jury could have concluded that appellant used a box cutter during the offense.

1. Y.D.'s convictions included one misdemeanor theft conviction, five prostitution convictions, a state jail felony conviction for posses-sion of a controlled substance, and federal convictions for embezzlement and felony theft.

Appellant also points out that Y.D. gave conflicting testimony regarding a man she saw coming out of an apartment neighboring appellant's apartment. Officer Trull testified that Y.D. told him she saw the neighbor when she and appellant first arrived at his apartment. At trial, Y.D. testified that she saw the neighbor as she and appellant were leaving his apartment. In light of the fact that Officer Trull testified that Y.D. was upset and crying when she initially told him what had happened to her, the jury could have believed that Y.D. was telling the truth about the assault despite this inconsistency.

*Lack of Consent*

■ Lastly, appellant complains that the evidence was factually insufficient to show lack of consent to sex on the part of Y.D. First, he argues that Y.D. gave inconsistent testimony as to whether she told appellant to stop having intercourse with her. On both direct and cross-examination, Y.D. testified that she told appellant to stop. First, she stated, "He had gave me some money because I had told him to stop, and I don't know how long [the intercourse] happened but I eventually got him up off me." Appellant contends that the above statement contradicts the following testimony:

[PROSECUTOR] Is that what you were saying, he was pulling your hair?

[Y.D.] No, the braids—he pulled the braids out.

Q. He pulled the braids out?

A. Yeah, he pulled them aloose.

Q. We are talking this was your real hair?

A. Yeah, he pulled them aloose. It wasn't no braids. They was all loose in all of them.

Q. Did that hurt?

A. Yeah.

Q. Did you ever tell him stop?

A. Yeah, I did. Yes, sir.

Q. How did you tell him that?

A. Actually, I didn't tell him to stop. I just told him that he was hurting me, that he needed to slow down. I said, don't pull my hair so hard because you are hurting me. He wasn't listening. He just kept on doing it.

While appellant contends the above question of whether Y.D. asked him to stop relates to intercourse, the jury was free to conclude that the question related only to whether she asked appellant to stop pulling her hair. Thus, even though the above statements are somewhat ambiguous and open to interpretation, they are not dispositive on the issue of consent.

Next, appellant contends that Y.D. participated in sexual intercourse with him in exchange for payment, not because she feared for her safety. Appellant points to Y.D.'s interview with Detective Spivey in which she stated that she was not scared of appellant. However, appellant takes Y.D.'s statement out of context because she actually stated that she was not scared of appellant, "but he had a razor." Y.D. explained on redirect examination that she was not afraid of appellant but was afraid of the razor he carried.

Although the record shows that Y.D. at times appeared motivated by payment, it supports the jury's finding that she was forced to participate in sexual intercourse with appellant because he threatened her. For example, appellant points to the fact that Y.D. pushed appellant off of her during sex because he was hurting her as evidence that Y.D. was not afraid of appellant. But appellant's argument ignores the fact that Y.D. was forced by appellant to continue having sex with him because he pulled the box cutter out of his pants, showed it to her, and told her that he was going to finish what he was doing. Y.D.

testified that she only let him continue because she was afraid appellant would cut her with the "razor."

Appellant also argues that Y.D.'s statement to him in his apartment that she wanted to "get it over with" indicated that the sex was consensual. However, the jury could have interpreted the statement to mean that Y.D. knew what was going to happen to her and did not want to prolong it. Appellant also points to the fact that he did not "beat up" Y.D. as evidence that the sex was consensual. However, the record reveals that appellant held a box cutter to her throat while driving her to his apartment; when at the apartment, threatened to kill her if she screamed; threatened her with the box cutter during intercourse, telling her he was going to finish what he was doing; treated her roughly by pulling her hair and causing her pain; and, ultimately, refused to stop although Y.D. repeatedly told him that he was hurting her.

The penal code provides that a person commits the offense of aggravated sexual assault "if the person ... intentionally or knowingly ... (i) causes the penetration of the anus or sexual organ of another person by any means, without that person's consent; [or] (ii) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent." TEX. PENAL CODE ANN. § 22.021(a)(1) (Vernon Supp.2004–05). Our review of the record reveals evidence showing that after initially agreeing to go to appellant's apartment, Y.D. changed her mind and asked appellant to take her back to where he had picked her up; appellant refused, pulled out a box cutter, and held it to her throat. When they arrived at the apartment, it was undisputed that appellant had intercourse vaginally and orally with Y.D. While having intercourse, ap-

pellant threatened her with a weapon in order to force her to continue having sex with him and refused to stop after she repeatedly told him that he was hurting her.

The evidence we have detailed is not too weak to support the jury's finding of guilt, nor is the evidence contrary to the finding so strong that guilt cannot be proven beyond a reasonable doubt. See Zuniga, 144 S.W.3d at 485. Accordingly, we hold that the evidence was factually sufficient to support the jury's verdict. Appellant's first issue is overruled.

## ADMISSION OF EVIDENCE

In his remaining issues, appellant complains that the trial court erred by admitting various exhibits and certain testimony.

### Standard of Review

The admission of evidence is a matter within the discretion of the trial court. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex.Crim.App.1990). As long as the trial court's ruling admitting the evidence was within the "zone of reasonable disagreement," there is no abuse of discretion and the trial court's ruling will be upheld. *Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim.App.1996).

### Witness Statement

In appellant's second and third issues, he complains that the trial court erred by admitting exhibits containing his written statement to police because they are inadmissible under Texas Rules of Evidence 404(b) and 403. The exhibits at issue are copies of a written statement made by appellant while in police custody. Appellant's statement is as follows: [2]

---

**2.** All errors are in original.

My partents are going through a divorce pressure builds up causes me to durink. Makes me mad and drepressed. So I start looking for something to get my mind off of things thats when I get in trouble and start durinking and pick up prostutes. When I pick them up I'm arerend mad I told one of them if she try anything to hurt me I wood hurt her with a boxcuter. And a nother one I lift with her purse still in my car.

Appellant's trial counsel objected under rule 404(b), arguing that the statement is not a confession and it is unclear whether the reference to the box cutter refers to the incident with Y.D. or whether it refers to an incident with a different prostitute. Counsel also stated that the exhibit was "only being admitted for the purpose of inflaming the jury and making them speculate that the box cutter that is being spoken of in here ... [is] the same box cutter that was used in a specific—in this specific case[;] that is not what this indicates." The State responded by arguing that the statement is relevant to appellant's motive and intent and it corroborates Y.D.'s testimony.

During the discussion regarding the admissibility of the statement, the trial court indicated that it was concerned about the other extraneous offenses mentioned in the statement, i.e., getting drunk and picking up prostitutes, not just Y.D. In clarifying his objection, defense counsel stated that his objection is

> that they [the State] intend to prove that that box cutter statement goes directly to that young lady [Y.D.]. And I say that is making the jury leap[,] speculate[,] and is prejudicial to my client for them to take that position that that statement that he made there, which is exculpatory, is trying to imply that that box cutter that he was talking about is

the same box cutter being used here in this court.

The State also informed the trial court that appellant made the statement after he was arrested and questioned about Y.D.'s case; thus, appellant's references to the box cutter went directly to the incident with Y.D.

 Rule 404(b) prohibits the admission of evidence of "other crimes, wrongs or acts" in a criminal case to prove that the defendant acted in conformity with his character to commit crimes. TEX.R. EVID. 404(b). Once the opponent objects to such evidence, it is incumbent upon the proponent of the evidence to show that the evidence has relevance apart from its tendency to prove the defendant acted in conformity with his character. *Montgomery*, 810 S.W.2d at 388 (op. on reh'g). If the trial court determines the evidence has no relevance apart from character conformity, then the evidence is inadmissible. *Id.* "However, the proponent of the evidence may convince the court the evidence is relevant to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory." *Massey v. State*, 933 S.W.2d 582, 586 (Tex.App.-Houston [1st Dist.] 1996, no pet.).

 " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Here, the State argues that the written statement was relevant to corroborate Y.D.'s testimony that appellant threatened her with a box cutter and went to the issue of consent. The trial court admitted the statement because

it basically states that [appellant engaged] in drinking and picking up prostitutes, and also it states in here about the box cutter, since the box cutter has been related to this particular case, and *since he was arrested to—pertaining to this particular case,* it is [the trial court's] opinion that he is talking about this particular case. [Emphasis added.]

Thus, it appears the trial court believed that the portion of the statement in which appellant admitted to threatening a prostitute with a box cutter referred to Y.D. and corroborated her testimony. No evidence was admitted at guilt-innocence about the other extraneous acts revealed in the statement, i.e., drinking, getting mad, and picking up other prostitutes. Accordingly, we hold that the trial court did not abuse its discretion in admitting the statement under rule 404(b) both to corroborate Y.D.'s testimony and because it was relevant to the issue of consent.

■■ Next, we must determine whether the trial court abused its discretion in admitting the evidence under rule 403. *See Montgomery,* 810 S.W.2d at 388. Rule 403 allows the admission of relevant evidence unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion, undue delay, or the unnecessary presentation of cumulative evidence. Tex.R. Evid. 403. Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial. *Montgomery,* 810 S.W.2d at 389. In *Santellan v. State,* 939 S.W.2d 155 (Tex.Crim.App. 1997), the court of criminal appeals restated the factors discussed in *Montgomery* that should go into the balancing test:

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent

to show the defendant in fact committed the extraneous offense;

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; [and]

(4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Id.* at 169 (footnote omitted).

Here, appellant's statement about the box cutter corroborates Y.D.'s testimony about her lack of consent and thus makes it more probable that she did not consent to sex with appellant. As appellant notes in his earlier points, Y.D.'s criminal history and drug use did not make her the ideal witness. For that same reason, the State had a strong need for the evidence. Although the police found a box cutter at appellant's apartment, the jury could have concluded that appellant's owning a box cutter was not unusual and that Y.D. could have seen it when she was at appellant's apartment. Thus, appellant's statement strengthened the State's case on the consent issue.

In addition, while the acts described in appellant's statement were probably distasteful to at least some, if not all, of the jury members, they are not any more inflammatory than the charged offense. In fact, appellant's statement about the box cutter purports to be exculpatory by implying that he was responding to a threat. Moreover, the amount of time the State spent developing testimony about the statement was very small compared to the rest of the record. And the prosecutors

did not unduly emphasize the statement in their closing arguments; the bulk of their arguments focused on Y.D. and her testimony. Thus, we conclude that the trial court did not abuse its discretion in admitting evidence of appellant's statement under rule 403.

We overrule appellant's second and third issues.

### Hearsay Statements, Admission of Exhibits 53 and 55, and the Confrontation Clause

In his fourth through seventh issues, appellant complains that the trial court erred during the punishment phase of trial by admitting the hearsay statements of L.J. and K.G. and DNA evidence reports linking appellant to the alleged sexual assaults of both of these women. Specifically, appellant complains that the trial court erred by allowing two police officers to testify about statements the women made when they reported being sexually assaulted and by admitting the DNA evidence through the police officers. Appellant asserts that in allowing the statements and exhibits into evidence, the trial court violated his constitutional right to confront and cross-examine witnesses under the Sixth and Fourteenth Amendments. The State responds that the statements were properly admitted as nontestimonial excited utterances under evidence rule 803(2). TEX.R. EVID. 803(2). Appellant stipulated to the admissibility of the exhibits but conditioned his stipulation on his prior Confrontation Clause objection.

Fort Worth Police Officer Thomas Shelton testified that on August 17, 2000, he found L.J. walking down the street. Her pants were torn and she was "crying" and "upset." Officer Shelton asked her what had happened and she responded, still crying and "very emotional," that approximately three hours earlier she had been walking home from the store when a car pulled up beside her and asked her how she was doing. According to Officer Shelton, she then described how the car pulled over when she walked away from it and the driver got out, grabbed her, held a gun to her side, and told her to get into the car. They drove to an old concrete factory, pulled into the parking lot, and the driver made L.J. perform oral sex on him. Afterwards, L.J. and the driver went into the building and the driver had sexual intercourse with L.J. without her consent.

The State admitted exhibit 53 during punishment. The exhibit was a DNA lab report regarding a piece of paper with semen on it found at the concrete factory where L.J. alleged she was raped. DNA analysis confirmed that the semen on the paper came from appellant.

The other contested testimony came from Fort Worth Police Officer Daryl Horn. Officer Horn testified that on September 27, 2001, he was flagged down by K.G. in a park near Benbrook Lake. Officer Horn described K.G. as being "very upset, very emotionally distraught, almost hysterical." Officer Horn testified that K.G. told him that she had been raped and robbed in the park approximately twenty to thirty minutes earlier. While K.G. and Officer Horn spoke, K.G. continued to cry and be upset. K.G. told Officer Horn that she had been trying to find a ride home when a man in a car pulled over and she offered him two dollars to drive her home. The driver took her to an apartment complex near Hulen Street and went inside. When the driver came out, he screamed at K.G. and told her that she was going to obey him. The driver took K.G. to the park near Benbrook Lake and sexually assaulted her for two to two-and-a-half hours. After the driver ejaculated, he robbed K.G. of forty dollars. Officer Horn took K.G. to the hospital for a rape exam.

DNA analysis of the semen found in K.G. showed that it belonged to appellant.

### Admissibility Under Confrontation Clause

■ We review de novo the trial court's ruling that the admission of Officers Shelton's and Horn's testimony would not violate appellant's Confrontation Clause rights. *See Lilly v. Virginia*, 527 U.S. 116, 137, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999) (holding that "when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause"). The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him." U.S. Const. amend. VI. The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact. *Lilly*, 527 U.S. at 123–24, 119 S.Ct. at 1894.

At the time of appellant's trial, a Confrontation Clause challenge to the admissibility of an out-of-court statement offered against the accused was governed by *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under *Roberts*, before an out-of-court statement could be admitted, the hearsay declarant had to be unavailable if she was not present for cross-examination at trial. Even then, her statement was admissible only if it bore adequate "indicia of reliability." Reliability could be shown by the presence of a firmly rooted hearsay exception or by particularized guarantees of trustworthiness. *Id.* at 66, 100 S.Ct. at 2539.

While appellant's appeal was pending before this court, the Supreme Court replaced the *Roberts* test with a new test, set out in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the Court declared that the *Roberts* test was at once too broad because it applied the same analysis whether the out-of-court statement was testimonial or not, and too narrow because it admitted ex parte testimonial statements "upon a mere finding of reliability." *Id.* at 60, 124 S.Ct. at 1369.

■ *Crawford* distinguishes the standards used in determining the admissibility of nontestimonial statements from those applicable to testimonial statements. Under *Crawford*, without exception, testimonial statements of witnesses absent from trial are admissible over a Sixth Amendment Confrontation Clause objection only where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant.[3] *Id.* at 68, 124 S.Ct. at 1374. Testimonial statements from absent, unavailable witnesses are not admissible if the defendant has not had the opportunity to cross-examine the declarant. In contrast, nontestimonial statements of an unavailable declarant who has not been cross-examined may still be admitted as evidence in a criminal case if the statements qualify under an exception to the rule against hearsay. *Id.*

Therefore, the threshold question under *Crawford* is whether the statement offered is "testimonial" in nature.[4] Unfortunately,

---

**3.** *Crawford* was pending, certiorari granted, in the United States Supreme Court at the time of submission, and both sides acknowledged that the Supreme Court's holding in that case would be dispositive of the present case.

**4.** The Supreme Court derived this term from the Confrontation Clause's language, noting

the Supreme Court failed to define what constitutes a testimonial statement. Instead, the Court stated,

> We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* at 68, 124 S.Ct. at 1374.

■ Appellant argues in his reply brief that K.G.'s and L.J.'s statements are testimonial because they are analogous to statements made under police interrogation. The State argues that the statements are nontestimonial because they were not made during a police interrogation. The State characterizes each statement as a "call for help," not initiated by the police, that was part of "the criminal incident itself, not part of the prosecution that followed." Appellant concedes that a 911 call may constitute a nontestimonial "spontaneous declaration"; however, he contends that the statements in this case were not spontaneous, but rational, thinking responses to questions posed by the police.

Since *Crawford* was decided, several Texas and other courts have had the opportunity to examine whether certain out-of-court statements are testimonial. *See Key v. State,* — S.W.3d —, —, No. 12–04–00030–CR, 2005 WL 467167, at *3 (Tex.App.-Tyler Feb.28, 2005, pet. filed). "Most ... have held that initial police-victim interaction at the scene of an incident is not an interrogation and that admission of testimony about that interaction

does not offend the Confrontation Clause." *Id.; see also Spencer v. State,* 162 S.W.3d 877, 881 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.) (agreeing with *Key's* conclusion that "statements made to officers responding to a call during the initial assessment and securing of a crime scene are not testimonial"); *Wilson v. State,* 151 S.W.3d 694, 698 (Tex.App.-Fort Worth 2004, pet. ref'd) (holding that statements made by appellant's girlfriend to police at scene of accident were nontestimonial).

Here, the testifying officers did not seek out the victims for the purpose of investigating the offenses the victims eventually described. Indeed, the officers did not know if any offense had been committed when they first encountered the victims. The victims were not considered suspects, accomplices, or co-conspirators. The officers' testimony indicates that each one asked questions of a lone, visibly upset female in a deserted place in the middle of the night in an attempt to determine the reason for her emotional state. We conclude that the victims' statements to the officers were not the product of custodial interrogation, nor were they responses to tactically "structured police questioning." *See Crawford,* 541 U.S. at 53 n. 4, 124 S.Ct. at 1365 n. 4.

■ Moreover, even if the trial court had abused its discretion in admitting L.J.'s and K.G.'s statements to the police, any error would be harmless. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); Tex.R.App. P. 44.2(a). DNA tests corroborated the testimony that appellant had engaged in sexual intercourse with the declarants. The officers' observations of the disheveled appearance and disturbed and emotional demeanor of the declarants also corroborated the testimony that they had

that the Clause is concerned with "witnesses," whom the Court identifies as those

who "bear testimony." *Id.* at 51, 124 S.Ct. at 1364.

been assaulted. In addition to Y.D.'s testimony at guilt-innocence, five other prostitutes testified at punishment that appellant assaulted them. Appellant was able to cross-examine all of them. In light of the evidence corroborating L.J.'s and K.G.'s statements; the strength of the State's case against appellant, the cumulative nature of the evidence, and the relative unimportance of the hearsay testimony—as evidenced by the testimony of the five other women who testified to similar assaults by appellant; and the fact that appellant was able to cross-examine all of those women, we can determine beyond a reasonable doubt that the admission of L.J.'s and K.G.'s hearsay statements and the DNA evidence did not contribute to appellant's punishment.

### Admissibility as Excited Utterances

■ In addition to disputing whether L.J.'s and K.G.'s statements are admissible under *Crawford,* appellant also contends that the statements are not admissible as excited utterances under rule 803(2). TEX.R. EVID. 803(2). We disagree.

Although appellant asserts several reasons why L.J.'s and K.G.'s comments to the police are not excited utterances, the only reason he asserted at trial was that "it is not near the time period." Thus, we will address only appellant's contention that L.J.'s and K.G.'s comments, and the offenses described by them, were too remote in time from the occurrence of the offenses. *See* TEX.R.APP. P. 33.1(a)(1)(A); *Guevara v. State,* 97 S.W.3d 579, 583 (Tex. Crim.App.2003).

■ "It is not dispositive that [a] statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply

factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception." *Brown v. State,* 96 S.W.3d 508, 514 (Tex. App.-Austin 2002, no pet.).[5] The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *Id.* (quoting *Salazar v. State,* 38 S.W.3d 141, 154 (Tex.Crim.App.), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001)). Here, Officer Shelton testified that L.J. was upset and very emotional when he saw her and that she was still crying while she answered his questions. Officer Horn described K.G. as being "very upset, very emotionally distraught, almost hysterical." Considering the apparent emotional state of the women when the officers encountered them, we do not believe the trial court abused its discretion in determining that their statements were admissible as excited utterances. *See* TEX.R. EVID. 803(2); *Brown,* 96 S.W.3d at 514. Accordingly, we overrule appellant's fourth through seventh issues.

### CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

---

5. Because *Brown* is a pre-*Crawford* case, it is unclear whether the victim's statements to police are testimonial or nontestimonial because that issue is not analyzed.