

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00169-CR

_____

MICHAEL AARON MEARES, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1498421D

---

Before Kerr, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted Appellant Michael Aaron Meares of the offense of forgery and assessed his punishment at twelve years' incarceration and a $245 fine, and the trial court sentenced him accordingly. *See* Tex. Penal Code Ann. § 32.21(b), (e). Appellant challenges the sufficiency of the evidence regarding the intent-to-defraud-or-harm-another element of the offense and argues that the trial court erroneously allowed the State to introduce evidence of an extraneous offense. We affirm.

### II. BACKGROUND

On May 13, 2017, Appellant patronized a Fort Worth nightclub. After he parked his car, an attendant informed Appellant that it cost $5 to park. Appellant gave the attendant a $50 bill, and the attendant gave Appellant $45 change. The attendant stated that it was a quick transaction on a busy night and that he did not notice anything unusual about the $50 bill.

Once inside the nightclub, a waitress eventually approached Appellant to ask if he wanted a drink. Appellant ordered a drink and paid the waitress with another $50 bill. The waitress testified that the $50 bill "felt kind of funny" so she took it to the "cash cage," marked it with a money pen, and looked for the magnetic strip.[1] After

---

[1]At this nightclub, the waitress approaches customers to ask if they would like a drink. If so, she purchases the drink at the bar with her own money and then she is reimbursed by the customer. If the customer pays with a credit card, the waitress initially determines if the name on the card matches the customer's identification. If

2

discussing the $50 bill with management, the waitress informed Appellant that she could not accept the $50 bill and asked if he had another form of payment. Appellant gave the waitress a credit card, but she rejected it because the name on the card did not match the name on Appellant's identification. When he gave her a different credit card, which matched his identification, the card was declined when she tried to charge it. The waitress stated that when Appellant was going through his wallet, she saw that he also had a $100 bill in it.

The police were called to the nightclub. While waiting for the police to arrive, a manager and security guard took Appellant outside, and the parking attendant was made aware that the police were on their way because Appellant had used counterfeit money. At that time, the attendant remembered that Appellant had given him a $50 bill, so he had the manager check it. They determined that it was also a fake.

Two Fort Worth police officers arrived at the nightclub and were presented with two $50 bills. One of the officers stated that they "didn't feel like normal legitimate U.S. currency would feel like." The officer elaborated that the $50 bills did not appear to be "genuine currency" because they were misaligned, lacked a security strip, and had the same serial number:

> Q. Can you explain to this jury, again, the factors that you saw in that bill that led you to believe it was not a genuine currency?

the names match, the waitress takes the card to a "cash cage" where the card is inspected by management and preauthorized, at which point the waitress takes the receipt to the customer to sign.

A.  I saw that the alignment and the cut on it, it's -- the border of the light on the top and thick on the bottom.  There wasn't a security strip on it, and the feeling of it wasn't correct.

Q.  And now I'm putting up there State's Exhibit Number 2, and is that the back of State's Exhibit Number 1?

A.  Yes.

Q.  And does the alignment on State's Exhibit Number 2 match up with what the alignment in State's Exhibit Number 1 was?

A.  No.  It's -- the top and bottom are more centered, but the right and left are misaligned.

Q.  State's Exhibit Number 3, that's a different $50 bill, correct?

A.  Correct.

Q.  And what factors did you see in this $50 bill that led you to believe that it was counterfeit?

A.  The factors were that the alignment on the top and the left side were -- were very thin, and the right -- or the bottom were very thick.  And also, there was not a security strip, and it did not feel correct as well as it matching the same serial number as the prior one.

Q.  So just to be clear, the serial number -- can you read that serial number for the Court?

A.  Yes.  EG18220775A.

Q.  And that's on State's Exhibit Number 3.  I'm going to put State's Exhibit Number 1 back up there.

Can you please read that serial number?

A.  EG18220775A.

Q.  And those are the same serial number for both?

4

A. Correct.

The officers arrested Appellant for forgery and conducted a search incident to the arrest. The officers found numerous items during the search, including a Chase Visa debit card with a name other than Appellant's, three credit cards with Appellant's name on them, and a debit and credit card from a different person than Appellant who shared his last name. They also found three genuine $1 bills. When Appellant was booked into jail, the officers found a counterfeit $100 bill in the bottom of his right sock.

Appellant was indicted for the offense of forgery. *See id.* At trial, the State called four witnesses: the waitress, the parking attendant, the arresting officer, and a special agent with the United States Secret Service.[2] Numerous exhibits were admitted during the trial on merits.[3] The jury returned a guilty verdict and assessed Appellant's punishment at twelve years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $245 fine. This appeal followed.

---

[2]The Secret Service agent testified that the $50 and $100 bills were not "genuine U.S. currencies." He further testified that they were not printed on proper paper and lacked the embedded red and blue fibers that the U.S. Bureau of Engraving and Printing uses in its printing process. And, he testified that two bills of the same denomination will never have the same serial number.

[3]The trial court sustained Appellant's objections to State's Exhibits 11, 12, and 13—all of which concern apparent drug paraphernalia found on Appellant when he was arrested. However, the trial court overruled Appellant's objections to State's Exhibits 7, 8, 9, and 10—photocopies of the debit and credit cards found on Appellant.

## III. SUFFICIENCY

In his first point, Appellant argues that the evidence is not sufficient to show one element of the offense of forgery—that Appellant acted with intent to defraud or harm another—because he contends that the State failed to set forth any evidence that Appellant knew the $50 and $100 bills were forged. The State counters that the circumstantial evidence is sufficient for rational jurors to conclude beyond a reasonable doubt that Appellant knew that the $50 and $100 bills were forged.

### A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved

6

any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## B. Applicable Law

"A person commits the offense of forgery if he 'forges a writing with intent to defraud or harm another.'" *Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting Tex. Penal Code Ann. § 32.21(b)); *Johnson v. State*, 425 S.W.3d 516, 520 (Tex. App.—Houston [1st Dist.]), *pet. ref'd*, 397 S.W.3d 657 (Tex. Crim. App. 2012).

To prove the requisite intent to harm or defraud another in a forgery case, "the trier of fact must be able to reasonably infer that Appellant knew the instrument was forged beyond a reasonable doubt." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *see Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2013) ("[T]he State necessarily had to prove that [Appellant] knew that the bills were forged."). The intent to defraud or harm may be established by circumstantial evidence, although the "mere possession, passage, or presentment of a forged instrument does not support an inference of intent to defraud." *Leroy*, 512 S.W.3d at 543; *see also Kitzmiller v. State*, No. 02-14-00309-CR, 2015 WL 4504359, at *4 (Tex. App.—Fort Worth July 23, 2015, no pet.) (mem. op., not designated for publication).

## C. Analysis

The evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Appellant knew that the $50 and $100 bills were forged because their

7

inauthenticity was apparent based on a superficial inspection. *See Ramsey*, 473 S.W.3d at 809.

The waitress testified that the $50 bill that Appellant gave her "felt kind of funny" and different from other bills. The police officer likewise testified that the $50 bills felt and looked different from normal currency. He testified that the original $50 bill looked different because it was "off-aligned and the cut was wrong," it lacked a security strip, and both it and the second $50 bill contained the same serial number. The jury had these bills, and the $100 bill that the waitress saw in Appellant's wallet—the same bill that the police found in his sock when he was booked into jail—in evidence before them. And the secret service agent explained why those bills felt and looked different from authentic currency. The parking attendant testified that he gave Appellant $45 change, but Appellant did not try to pay the waitress with those funds, instead attempting to pay her with a fake $50 and then someone else's credit card.

Viewing the totality of this circumstantial evidence in the light most favorable to the verdict, a rational jury could have concluded beyond a reasonable doubt that Appellant knew the $50 and $100 bills were forged and thus that he had the requisite intent to defraud or harm another. *See Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd). That is, it was reasonable for the jury to infer from the waitress's testimony and police officer's testimony that Appellant knew that the $50 bills were forged because they did not feel or look like normal currency and because they had the same serial number. Both the waitress and police officer

8

testified that it was obvious from merely touching the bills that they lacked the texture of normal currency. Further, the police officer testified that the borders of the bills were misaligned. Thus, the bills had both tactile and visible characteristics of inauthenticity that were apparent from a superficial inspection. *See Gaines v. State*, No. 05-02-00328-CR, 2002 WL 31646472, at *2 (Tex. App.—Dallas Nov. 25, 2002, pet. ref'd) (not designated for publication) (holding circumstantial evidence was sufficient to establish beyond a reasonable doubt that the appellant knew the photocopied $20 bills were forged and thus establish the intent-to-defraud-or-harm-another element when the appellant was "arrested with four twenty-dollar bills in his pocket that bore the same serial number as a forged bill that was successfully passed at [a] motel" and when the appellant kept a large amount of cash separate from the counterfeit bills).

It was also reasonable for the jury to infer from the waitress's testimony that she saw the $100 bill in Appellant's wallet and from the police officer's testimony that he discovered a forged $100 bill in Appellant's sock that Appellant knew the $100 bill was forged and that he moved it from his wallet to his sock to hide it. *See id.*

Finally, it was reasonable for the jury to infer that the reason Appellant did not attempt to pay for his drinks with the $45 in change he received from the parking attendant and instead attempted to first pay with someone else's credit card was because he knew the $50 bill was counterfeit and he was trying to convert it into legal tender. His deliberate use of someone else's credit card immediately after the waitress rejected the counterfeit $50 bill undermines Appellant's position that the use of the

9

counterfeit bills was unintentional and thus lends further support to the rational inference that Appellant knew the bills were counterfeit. *See Word v. State*, No. 11-14-00292-CR, 2016 WL 5853224, at *2 (Tex. App.—Eastland Sept. 30, 2016, no pet.) (mem. op., not designated for publication) (holding circumstantial evidence was sufficient to support intent-to-defraud-or-harm element of forgery when the appellant had undisputedly passed a counterfeit $100 bill because the jury could reasonably infer that the appellant knew the $100 bill was counterfeit when her "use of two $100 bills to make relatively small purchases suggest[s] that she was attempting to convert counterfeit currency into legal tender").

As Appellant argues, the fact that he did not flee and instead waited for the police to show up could be some evidence that Appellant did not know that the $50 and $100 bills were forged. *Cf. Griffin v. State*, 908 S.W.2d 624, 628 (Tex. App.—Beaumont 1995, no pet.) (listing attempting to flee as one of the "suspicious circumstances" courts have considered that show the defendant knew a check was forged). However, when the record supports conflicting inferences, our standard of review presumes that the trier of fact resolved any such inferences in favor of the verdict, and we affirm the verdict as long as the inferences are reasonable. *Matson*, 819 S.W.2d at 846. And, as explained above, there is sufficient evidence to support the jury's reasonable inference that Appellant knew the $50 and $100 bills were forged.

10

Therefore, we hold the evidence is sufficient to support the jury's conclusion that the State established the intent-to-defraud-or-harm-another element of forgery beyond a reasonable doubt. *See Word*, 2016 WL 5853224, at \*2; *Gaines*, 2002 WL 31646472, at \*2. Accordingly, we overrule Appellant's first point.

## IV. EXTRANEOUS-OFFENSE EVIDENCE

In his second point, Appellant complains that the trial court erroneously admitted improper extraneous-offense evidence regarding his attempted use of a credit card that was not in his name. The State argues that Appellant failed to preserve any such error because Appellant failed to object to this portion of the waitress's testimony. The State further argues that even if the complaint is preserved, the extraneous-offense evidence regarding the credit card was not solely for character-conformity purposes but to show Appellant's intent. The State finally argues that even if the complaint is preserved and the extraneous-offense evidence was erroneously admitted, it is not reversible because Appellant cannot show it affected his substantial rights.

### A. Applicable Law

Under rule 404(b), evidence of a wrong "or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1); *Marc v. State*, 166 S.W.3d 767, 775 (Tex. App.—Fort Worth 2005, pet. ref'd). However, also pursuant to rule 404(b), such evidence "may be admissible for another purpose, such as proving . . . intent."

11

Tex. R. Evid. 404(b)(2); *De La Paz v. State*, 279 S.W.3d 336, 342–43 (Tex. Crim. App. 2009). "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard, and so long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *De La Paz*, 279 S.W.3d at 343–44.

However, Texas law provides "that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Qualls*, 547 S.W.3d at 681 (same). Accordingly, our first consideration is if evidence of Appellant's attempted credit card abuse came in before or after Appellant's objection.

## B. Analysis

When the State sought to admit exhibits containing photocopies of the various credit and debit cards found on Appellant, Appellant objected on the ground that they were improper evidence of an extraneous offense, and the trial court overruled the objection.

However, the waitress had already testified, without objection, about Appellant's attempt to use a credit card that did not have his name on it:

12

Q. Okay. When you go back there and you're telling him, "I'm not accepting this $50 bill," what did he do next?

A. I told him that we could accept a credit card, but he has to have ID. He tried to first give me a credit card that didn't match his ID. Then he gave me one that did.

Q. Okay. So like you told us earlier, the procedure for it is you get the credit card, you get that person's ID.

Is that what you did in this occasion?

A. Yes.

Q. Okay. And the first credit card that he gave you was not with the name "Michael Meares"?

A. No.

Q. If you recall -- and it's been a while, do you recall what the name was on there?

A. I do not.

Q. But you're confident that it was not Aaron -- or sorry, Michael Aaron Meares?

A. Yes, I am, because it would have matched his ID.

Therefore, although Appellant objected to the admission of the exhibits regarding credit card abuse, we conclude that any error by the trial court overruling the objection is harmless because evidence of Appellant's use of a credit card that was not in his name had already been presented to the jury through the waitress's testimony. *See Leday*, 983 S.W.2d at 718; *Qualls*, 547 S.W.3d at 682 (concluding that because evidence in forgery case that the bills were counterfeit had been separately

13

received without objection, "error, if any, in the admission of . . . testimony that the bills in the photographs in State's Exhibits 1 and 2 were counterfeit was harmless").

Accordingly, we overrule Appellant's second point.

## V.  CONCLUSION

Having overruled Appellant's two points, we affirm the judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 11, 2019