**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00107-CR**
**NO. 09-21-00108-CR**

_____

**JORGE ARTURO MAR JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 18-10-13648-CR and 20-09-11180-CR**

**MEMORANDUM OPINION**

A jury convicted Appellant of two counts of aggravated sexual assault and made affirmative findings on the use of a deadly weapon. *See* Tex. Penal Code Ann. § 22.021(a)(1)(A). The trial court sentenced Appellant to concurrent terms of forty-five years each in the Institutional Division of the Texas Department of Criminal Justice.

1

On appeal, Appellant contends the trial court erred in permitting testimony of other complainants. He further contends the trial court erred in failing to grant a mistrial and in its wording of a protective order. Finding no reversible error, we affirm the trial court's judgments.

## I. Background

Appellant and N. L.[1] met through a social media platform called MeetMe. N.L. used the social media platform to trade sex for drugs. N.L. testified they met in person twice, with the first meeting in November of 2017, when they had a consensual sexual encounter, and then the second meeting in August of 2018, when Appellant allegedly committed the offenses in question. At trial, Appellant denied the charges against him and argued that N.L. fabricated her allegations of aggravated sexual assault in response to Appellant having paid for her services with counterfeit currency. We summarize the testimony relevant to Appellant's issues below.

### A. N.L.'s Testimony

At the time of the alleged offense, N.L. and her boyfriend were living in a motel in Spring. N.L. and Appellant communicated over social media and text messaging and arranged to meet to smoke marijuana. Appellant picked up N.L. in

---

[1] We refer to the victim and the civilian witnesses by their initials to conceal their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]"). *See Smith v. State*, No. 09-17-00081-CR, 2018 WL 1321410, at *1 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.).

his vehicle, which she described as a black Chevrolet Malibu with overly dark window tinting. They drove for a while and talked. Eventually, Appellant drove to a parking lot, and told N.L. he "wasn't going to give [her] help for free and that [she] would have to work for it[,]" meaning that he expected sexual services in exchange for the drugs or money he promised to provide.

After N.L. declined Appellant's request and attempted to persuade him to drive her back to the motel, he asked for her phone so that he could install a messaging application on it. Appellant then refused to return N.L.'s phone to her, causing N.L. to panic and threaten to call the police. At that time, Appellant threatened N.L. with a knife, telling her that if she failed to do what he said, he would "shank [her] and leave [her] there and beat [her] and nobody would care. And that he had done it before." N.L. complied with Appellant's demands out of fear for her life and performed oral sex on him, and Appellant then forced N.L. to have sexual intercourse with him.

Following the assaults, N.L. asked Appellant to return her phone to her and she told him she would not call the police. In response, Appellant threw what N.L. thought was her phone out of the car. N.L. believed Appellant had disposed of her phone, not just its case, so she exited the car to retrieve it. Appellant then sped off and N.L. ran back to her motel room and called the police. N.L. went to retrieve her phone and found only the case to her phone.

Appellant cross-examined N.L. regarding the details of her trial testimony and inconsistencies along with the lack of details in her earlier statements to law enforcement authorities, as well as her statement she gave to the investigator hired by the defense.

## B. Detective William Cooke's Testimony

Detective Cooke, an employee of the Houston Police Department, authenticated State's Exhibit 38, a vehicle registration form identifying Appellant's father as the registered owner of a black 2018 Chevrolet Malibu. Cooke described the search of the vehicle in question, and testified that the search yielded a knife, a condom, and Appellant's wallet, as shown in the State's exhibits.

Cooke testified that while he was investigating N.L.'s case, he identified other victims Appellant had allegedly sexually assaulted, specifically, J.K. and P.H. Cooke noted multiple similarities between the J.K., P.H. and N.L. assaults. In particular, he stated that Appellant met all three women through the same social media platform and threatened all of them with a knife when they declined sexual contact. In addition, Appellant threw J.K.'s phone case out of the car window shortly before leaving the scene of the assault.

Appellant cross-examined Cooke about the communications between Appellant and his victims, paying particular attention to the references to exchanging money and sex.

4

**C. Deputy Leneka Winters' Testimony**

Deputy Winters, an employee of the Harris County Sheriff's Office, described her background and experience in law enforcement. At the time of trial, Winters was assigned to the adult sex crimes section of the Harris County Sheriff's Office, tasked with investigating allegations of "sexual assault or anything sexual involving an adult." Winters investigated an alleged sexual assault against S.D., and Winter's testimony echoed much of Cooke's testimony regarding the similarities between the alleged assault on S.D. and the assault on N.L. Like Cooke, Winters noted the use of social media as well as discussions of sex, drugs, and money and the use of a counterfeit $100 bill. She also acknowledged that the social media application may be used for prostitution.

**D. Testimony of S.D.**

S.D. testified that Appellant contacted her through social media, and the two of them then communicated by way of text message. They agreed to meet in person, and S.D. drove to the designated location to meet Appellant. S.D. joined Appellant in his vehicle, and the two of them chatted for a while; eventually they broached the subjects of money and sex. After S.D. told Appellant multiple times, she did not want to exchange sex for money, Appellant "turn[ed] ugly," and not only threatened her with a knife, but told her he had a gun. Appellant then coerced S.D. into engaging in both oral and vaginal sex. During the assault, Appellant also stole money S.D. had

5

hidden in her bra. They argued about the stolen money, and Appellant responded by threatening to injure S.D. if she did not exit his car.

S.D. acknowledged that she did not initially report the sexual assault to the police but only reported the robbery. She soon corrected her report and reported the assault and went to a local hospital for a sexual assault examination. The 9-1-1 calls made by S.D. were admitted into evidence and played for the Jury.

### E. Testimony from J.K.

J.K. testified that she communicated with Appellant over social media and cell phone text messaging. They discussed relaxing and watching a movie together, so Appellant came to J.K.'s apartment. They then talked some more, and Appellant offered J.K. money in exchange for sex. J.K. refused, so they instead considered going to a fast-food restaurant and left J.K.'s apartment complex in Appellant's car. Eventually, Appellant drove to a parking lot, threatened J.K. with a knife and told her to get into the back seat, where he sexually assaulted her. Following the assault, Appellant drove J.K. to a gas station and ordered her out of his car but refused to return her phone. Instead, he threw her phone case out of the car and sped away from the scene. J.K. sought help from customers at the gas station, and they called the police for her.

J.K. acknowledged sending Appellant a message that invited sexual intercourse, but she testified that she "didn't mean that [she] wanted to."

6

## F. Testimony of P.H.

Like other witnesses, P.H. met Appellant through a social media platform. Although P.H. agreed to meet Appellant in person, she made it clear to him that she was not agreeing to sexual intercourse. At first, their meeting went well; they talked, and Appellant made P.H. "feel comfortable." Eventually, they kissed, and she performed consensual oral sex on Appellant. When Appellant became "a little forceful with" P.H., she changed her mind about staying with him and told him she needed to go home. Appellant then became aggressive. He removed P.H.'s shirt and attempted to force vaginal sex on her. When P.H. resisted, Appellant threatened her with a knife. Appellant made stabbing motions with the knife, struck P.H. on the face with his hand, and called her a "stupid bitch."

P.H. again requested Appellant to take her home, but Appellant instead continued to beat P.H. and refused to return the phone he had taken from her. Despite being barefoot and shirtless, P.H. then left Appellant's car and flagged down a passerby for help. When she reached her home, she woke her mother and called the police.

## G. Additional Testimony

The jury also heard evidence from Sergeant Joshua Hilado explaining the procedure for conducting a photographic lineup. Pursuant to that procedure, N.L. and P.H. selected a photograph of Appellant and identified him as their assailant.

7

And the jury also heard evidence from Detective William Cooke describing the method of obtaining a search warrant for either a location or a suspect's DNA. The results of the DNA testing identified Appellant as the person whose DNA was found on N.L.'s underwear and also found on the swabs collected during S.D.'s and J.K.'s sexual assault examinations. Appellant stipulated to identity, meaning that he acknowledged it was his DNA.

## H. The Motion for Mistrial

During a break in the jury selection process, a bailiff escorted Appellant past some of the jurors. The bailiff asked the jurors to move aside, and Appellant contended that this event created the prejudicial impression he was in custody. Appellant therefore moved for a mistrial.

Both the bailiff and a legal assistant testified regarding this event. The legal assistant testified that Appellant was in street clothes at the time and was not handcuffed, shackled, or restrained in any manner. The bailiff confirmed asking the jurors to move but denied giving any indication Appellant was dangerous or in custody. The trial court relied on this testimony, in addition to its own perception of the situation, to deny Appellant's motion for a mistrial.

## II. Standard of Review

We review the trial court's admission of evidence for an abuse of discretion. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Layton v. State,*

8

280 S.W.3d 235, 240 (Tex. Crim. App. 2009). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736; *Layton*, 280 S.W.3d at 240. In addition, we uphold the ruling on the admission of evidence if it was correct on any theory of law supported by the record and applicable to the case, in light of what was before the trial court at the time the ruling was made. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Appellant's motion for mistrial also is reviewed under an abuse of discretion standard. *See Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016). An appellate court considers only those arguments before the court at the time of the ruling. *See Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id*.

### III. Analysis

**A. Extraneous Offense Evidence**

Appellant contends that the trial court erred in admitting the testimony of J.K., P.H., and S.D., because this evidence was inadmissible propensity evidence. *See* Tex. R. Evid. 404(b)(1). Appellant concedes that the evidence of these alleged extraneous offenses would have been admissible to rebut a defense of consent, but

he contends that he did not base his defense on consent, but instead "cleverly attacked the credibility of the State's witnesses." We disagree.

Appellant emphasizes his decision not to question N.L. about consent. Cross-examination is not, however, the only way to raise a defensive issue. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016). A defendant may raise defensive issues such as consent and fabrication at other stages of the trial, including jury selection and opening statement. *Id.; see also Bass v. State,* 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (discussing claims of fabrication or retaliation); *Grant v. State,* 475 S.W.3d 409, 417-18 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (discussing consent). Appellant raised consent during all three phases: voir dire, opening statement, and cross-examination. By doing so, he made it clear that his theory of the case was that N.L. consented but later fabricated her allegation of aggravated sexual assault.

During the jury selection process, Appellant asked the jury panel whether "false accusations happen[,]" and asked a particular panel member "[w]hat could be a possible reason for a false accusation? Why would somebody falsely accuse somebody?" Appellant's questions elicited responses ranging from "revenge" to "regret" and Appellant followed up on these responses. Appellant also questioned the panel about consent. He specifically referenced non-verbal consent, as expressed between people in a relationship. The defense attorney's questions conveyed

Appellant's intent to claim, as he claimed during his closing argument, that N.L. consented on August 1, 2018 because she had consented previously.

Appellant again raised consent in his opening statement when he stated "[i]t's not about anything other than consent[,] . . . it was a consensual act[,]" and referenced N.L.'s previous consensual contact with Appellant. During his cross-examination of witnesses, Appellant continued to press the issue of consent. Although Appellant did not directly question N.L. about consent, he did not need to do so for consent to be a pervasive theme in his defense. Appellant asked a forensic scientist whether the presence of Appellant's DNA signified consent and asked a deputy sheriff about prostitution in the vicinity of the motel. These questions implied that N.L. was working as a prostitute, and that she consented to sex with Appellant.

Having determined that the challenged evidence was relevant to rebut Appellant's defensive theory of consent and fabrication, we next review whether the trial court abused its discretion by overruling Appellant's Rule 403 objections. *See* Tex. R. Evid. 403; *Perkins v. State*, No. PD-0310-20, 2022 WL 4088529, at *5-6 (Tex. Crim. App. Sep. 7, 2022). Appellant argued that the State's proposed evidence of extraneous offenses would be not only confusing to the jury and unduly prejudicial, but also it would needlessly prolong the trial. The trial court performed a balancing test and overruled the objections. When we review a "trial court's balancing test determination," we do not reverse the trial court's judgement lightly

and do so "'rarely and only after a clear abuse of discretion.'" *Id*. (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). That said, we do not just end our review by saying the trial court applied a balancing test. Instead, "the trial court's ruling must be measured against the relevant criteria by which a Rule 403 decision is made." *Id*. We examine:

1. How compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable;
2. The potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;
3. The time the proponent needs to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and
4. The proponent's need for the evidence.

*Id.* at *5.

The doctrine of chances is "the principle that evidence of the repetition of similar unusual events over time demonstrate a decreasing probability that those unusual events occurred by chance." *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). The evidence that Appellant committed three extraneous aggravated sexual assaults makes it more probable that Appellant committed the aggravated sexual assault charged in the instant case. This same principle is relevant to the State's need for the evidence of the extraneous offenses, for it "strengthened the State's case on the consent issue." *Marc v. State,* 166 S.W.3d 767, 776 (Tex. App.—Fort Worth 2005, pet. ref'd). As the State noted during the trial,

12

when the defense of consent is made in this situation like that, there's really no other way for the State to rebut that defensive theory other than to say under the Doctrine of Chances. It is extremely hard to believe – while something like that might be able to happen once, it's extremely hard to believe that it happened four times to the same unfortunate defendant.

In short, the State needed the extraneous evidence because it made a fact of consequence more probable. The first and fourth factors weigh in favor of admissibility.

Although the challenged evidence did have the potential to impress the jury with an impermissible inference of character conformity, the trial court addressed any such inference by giving the jury a limiting instruction during the trial and in the jury charge.[2] This instruction unambiguously limited the jury's consideration of the extraneous offenses, and the jury is presumed to have followed the instruction. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (holding that absent contrary evidence, a jury is presumed to have followed a limiting instruction). Accordingly, the second factor also favors admissibility.

---

[2] The instruction read as follows:

You are further instructed that if there's any evidence before you in this case regarding the Defendant's committing an alleged offense or offenses other than the offense alleged against him in the Indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offense or offenses, if any, and even then, you may only consider the same in determining the motive, intent, preparation, plan, knowledge, or lack of consent, if any, in connection with the offense, if any, alleged against [the defendant] in the Indictment and for no other purpose.

13

The trial court also considered the amount of time needed to present the evidence of the extraneous offenses. The State streamlined its presentation, eliminating several witnesses. Although the presentation of the State's remaining witnesses did prolong the trial, we do not find *undue* delay. This third factor also favors admissibility.

After "measur[ing] the trial court's ruling against the relevant criteria by which a Rule 403 decision is made[,]" we conclude that the trial court did not abuse its discretion in admitting the evidence of the extraneous offenses. *Perkins,* 2022 WL 4088529, at *6. We overrule Appellant's first point on appeal.

## B. Presumption of Innocence

In his second appellate issue, Appellant posits that the trial court should have granted his motion for mistrial because a deputy escorted him past potential jurors and asked those jurors to move aside. Appellant contends that because other individuals were not similarly escorted, this event damaged his presumption of innocence and he therefore was entitled to a mistrial. Appellant does not, however, refer us to any case authority supporting his argument. Instead, Appellant references case law holding that it is improper to try a defendant in restraints or jail clothing,

14

and he argues that this authority applies to an unrestrained defendant in street clothes.[3]

We have found no authority supporting Appellant's position on this issue. To the contrary, in *Banks v. State*, our Court of Criminal Appeals rejected the identical argument. 643 S.W.2d 129, 133 (Tex. Crim App. 1982). The *Banks* court held that an unrestrained defendant, wearing street clothes, experienced no violation of his presumption of innocence when he was escorted from the courtroom "flanked on either side by a uniformed deputy sheriff." *Id.; see also Parra v. State,* 743 S.W.2d 281, 286 (Tex. App.—San Antonio 1987, pet. ref'd). We overrule Appellant's second point of error.

## C. Protective Order

In his final issue, Appellant contends that the trial court erred in maintaining the confidentiality of N.L.'s location information, despite there being no motion to do so. *See* Tex. Code Crim. Proc. Ann. art. 7B.005(b). Appellant is correct that neither N.L. nor the State moved to keep this information confidential. Appellant has not, however, explained how this alleged error harms him, and consequently he has waived his complaint. *See* Tex. R. App. P. 38.1(i); *Cardenas v. State*, 30 S.W.3d

---

[3] The undisputed evidence showed that Appellant was wearing street clothes at the time of this event, and was not handcuffed, shackled, or otherwise restrained.

384, 393-94 (Tex. Crim. App. 2000) (noting that failing to address alleged harm results in waiver due to inadequate briefing). We overrule his final issue.

## IV. Conclusion

To summarize, we conclude that the trial court did not abuse its discretion in admitting evidence of extraneous offenses or in denying Appellant's motion for mistrial. In addition, Appellant failed to show how the alleged protective orders harmed him, and therefore we overrule his final issue. Having overruled all of his issues, we affirm the trial court's judgments.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on July 5, 2022
Opinion Delivered November 9, 2022
Do Not Publish

Before Golemon, C.J., Kreger and Johnson, JJ.

16